# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39461**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Benjamin S. WILLIAMS**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 31 October 2019

————————————

*Military Judge:* Mark W. Milam.

*Approved sentence:* Dishonorable discharge, confinement for 59 months, and reduction to E-1. Sentence adjudged 1 November 2017 by GCM convened at Royal Air Force Mildenhall, United Kingdom.

*For Appellant:* Major Mark J. Schwartz, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before J. JOHNSON, POSCH, and KEY, *Appellate Military Judges.*

Judge POSCH delivered the opinion of the court, in which Senior Judge J. JOHNSON and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

POSCH, Judge:

A general court-martial composed of a military judge found Appellant guilty, contrary to his pleas, of two specifications of sexual assault and one specification of abusive sexual contact of CK, a child under the age of 16 years, in violation of Article 120b, Uniform Code of Military Justice (UCMJ), 10

U.S.C. § 920b.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 59 months, and reduction to the grade of E-1. Before taking action, the convening authority deferred the reduction in grade and mandatory forfeitures of Appellant's pay and allowances until action. At action, the convening authority approved the adjudged sentence and waived the mandatory forfeitures for a period of six months, or release from confinement, or expiration of term of service, whichever was sooner, for the benefit of Appellant's dependent spouse and children.

On appeal, Appellant assigns four errors: (1) whether the military judge erred in admitting text messages Appellant and CK exchanged in contravention to the rule of completeness; (2) whether Appellant's convictions are legally and factually sufficient; (3) whether Appellant was denied effective assistance of counsel because Staff Sergeant (SSgt) JS was not called to testify on Appellant's behalf; and (4) whether the sentence was too severe compared to cases involving similar convictions.[3] During our review we noted the convening authority's action omitted two days of credit against the sentence to confinement that was ordered by the military judge to remedy illegal pretrial confinement. Finding no prejudicial error, we affirm, but return the record of trial to The Judge Advocate General for remand to the convening authority to withdraw the incomplete action and substitute a corrected action that properly accounts for confinement credit ordered by the military judge.

## I. BACKGROUND

Appellant's convictions are founded on evidence of a sexual relationship he fostered with CK, who was Appellant's dependent and sister-in-law. At the age of 11, after CK's parents were deceased, CK moved in and lived with Appellant and her sister, Appellant's wife, at their home in Tucson, Arizona, and they became CK's legal guardians. Two years later, Appellant was transferred to Royal Air Force (RAF) Mildenhall, and the family moved with Appellant to the United Kingdom where the misconduct underlying Appellant's three convictions occurred.

---

[1] All references in this opinion to the Uniform Code of Military Justice, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Appellant was acquitted of two specifications each of sexual assault and abusive sexual contact of CK.

[3] Appellate defense counsel raises issues (1) and (2), which we reordered in this opinion. Appellant personally raises all four issues. *See United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

Testimony at trial established that before CK turned 16 years of age in 2016, Appellant penetrated her vulva with his fingers and penis, both on divers occasions, and caused CK's hands to touch his penis, also on divers occasions. Appellant's conduct was not revealed to authorities until CK was away from Appellant visiting relatives in Michigan. Two days before CK was supposed to fly home, a relative found inappropriate text messages Appellant sent to CK on her phone and reported the discovery to Appellant's wife (CK's sister) and the Michigan State Police (MSP).

CK turned 16 years of age just six weeks before her Michigan relative reported Appellant's misconduct to authorities. An investigation by the Air Force Office of Special Investigations (AFOSI) revealed more texts Appellant sent to CK, handwritten love letters Appellant gave to CK detailing his sexual feelings and desires, and admissions Appellant made to two noncommissioned officers (NCOs). CK lived with her Michigan relatives during the investigation and testified at Appellant's court-martial. Appellant was convicted on the basis of CK's testimony and evidence uncovered by the investigation.

## II. DISCUSSION

### A. Text Messages Exchanged between Appellant and CK

Appellant asserts the military judge erred when he admitted text messages obtained from a forensic examination of Appellant's and CK's cell phones offered as Prosecution Exhibits 1 and 2, respectively. We are not persuaded the military judge abused his discretion in admitting the evidence.

#### 1. Additional Background

CK testified that she and Appellant exchanged text messages, including texts Appellant sent to her before she turned 16 years of age. Appellant told CK to delete these texts after she received them, and she did. After Appellant learned he was under investigation he told a former supervisor that to prove his relationship with CK, the Government would have to look "through months of text messages" on both of their phones. Appellant assumed, however, that "that wasn't possible" because Appellant and CK "had deleted the text messages and whenever their phones updated it overrode the code."[4]

In fact, the Government discovered a limited number of text messages obtained from both Appellant's and CK's phones and offered them against Appellant at trial. The trial counsel presented testimony of a forensic examiner, Mr.

---

[4] Appellant was not charged with an offense involving the text messages or his supposed actions to delete or direct CK to delete them.

JY, from the Defense Cyber Crime Center/Computer Forensic Laboratory (DC3/CFL),[5] whom the court recognized as an expert in the field of computer forensics. Mr. JY found 24 text messages on Appellant's phone that were exchanged with CK's phone during a span of three months. The trial counsel offered these texts as Prosecution Exhibit 1 to show that Appellant selectively kept innocuous texts to make his relationship with CK appear normal if someone happened to look on his phone.

CK's phone, in contrast, contained fragments of 86 texts, offered as Prosecution Exhibit 2, which were exchanged with Appellant's phone during a period of just four days. Several texts revealed intimacy that was inappropriate for a relationship between a child and an adult: "Wish you were in the hot bath with me. . . ."; "I[']ve been in bed with you completely naked."; "Just be in your panties or naked. . . ."; and "[I]t was a complete turn on!" The trial counsel argued the lascivious texts, and the comparatively large number of texts in a shorter time span found on CK's phone, was evidence that Appellant had deleted incriminating texts from his own phone to hide his criminal behavior and thus was relevant to show Appellant's consciousness of guilt. Trial counsel similarly argued Appellant's text to CK, "Don[']t forget to delete," was Appellant's reminder to CK to delete their texts to conceal their relationship in the event someone would examine the contents of her phone; and, this text was also relevant to show Appellant's consciousness of guilt.

The text messages recovered from CK's phone were unlike texts found on Appellant's phone in that they had been deleted, and subsequently recovered using forensic tools employed by DC3/CFL. Mr. JY testified about shortcomings inherent to the recovery of these texts. He explained that the information in a text message is initially stored in at least two database files that reside on a phone. One database stores the actual message. A second database, or log file, stores the first 50 characters and records information about the message such as its date and time, and the phone number of the sending or receiving party, as applicable. When a cell phone user deletes a text message, the information is erased from the first database, but the first 50 characters remain in the log file of the second database until the file resets.

Forensic examination of CK's phone revealed that whole text messages exchanged between CK and Appellant could not be recovered because they had been deleted; however, truncated texts were accurately recorded and some remained in the log file despite the fact that only the first 50 characters were recoverable because of the technical limitations Mr. JY described. Prosecution

---

[5] Formerly known as the Defense Computer Forensic Laboratory (DCFL).

Exhibit 2 included these truncated texts, the date and time stamp on each message, and the telephone number of the party to whom, or from whom, the message was sent or received.

At trial, Appellant objected to the text messages in Prosecution Exhibits 1 and 2 on grounds of relevance, hearsay, lack of authentication, and because many of the messages in Prosecution Exhibit 2 were truncated and thus incomplete. The military judge admitted the evidence reasoning that the texts constituted admissions by Appellant and were relevant to show consciousness of guilt. With regard to the hearsay objection, the military judge found CK's texts were admitted not for the truth of the matter asserted therein, but to show Appellant's texts were received, and based on CK's responses, that they were acknowledged. The military judge found that Mr. JY had laid an appropriate foundation for, and authenticated, the evidence. Even if some texts were truncated, the full texts were irretrievable, the military judge found, owing to the "limitation of our technology," not fault of the Government.[6] The military judge concluded that the probative value of the texts was "very high," and not outweighed by the danger of unfair prejudice under Military Rule of Evidence (Mil. R. Evid.) 403.

### 2. Law

Military Rule of Evidence 403 allows a military judge to exclude relevant evidence "if its probative value is substantially outweighed by a danger of [*inter alia*] . . . unfair prejudice, confusing the issues, [or] misleading the members." When a military judge conducts a proper Mil. R. Evid. 403 balancing test before admitting evidence, his ruling will not be overturned "unless there is a clear abuse of discretion." *United States v. Ruppel*, 49 M.J. 247, 251 (C.A.A.F. 1998) (internal citation omitted). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

---

[6] The military judge adopted the reasoning of R.C.M. 703(f)(2), a rule governing production of evidence. The rule allows that "a party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process. However, if such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of or could have been prevented by the requesting party."

### 3. Analysis

Appellant asserts the military judge abused his discretion by admitting text messages recovered from Appellant's and CK's phones. Appellant's counsel challenges the military judge's finding that the complete texts were "irretrievable," characterizing this finding as an assumption made from Mr. JY's testimony, and claims the military judge's ruling deprived Appellant "of his right to exercise the rule of completeness with regards to this evidence." Appellant's counsel censures the Government for its "malfeasance," not just for losing electronic communications between Appellant and CK, but evidence that appellate counsel claims—without proffer or substantiation—was "exculpatory in nature."

As a threshold matter, we reject the unfounded assertion that text messages were lost owing to government misconduct because evidence of record decidedly refutes this claim. Two witnesses and Appellant's own text to CK point to Appellant's actions and direction to CK to delete their messages, and not government "malfeasance," as one reason why DC3/CFL was unable to recover the complete exchange of communications that were once stored on Appellant's and CK's phones. In like manner, Mr. JY's testimony established that shortcomings of technology, not government misconduct, was a second reason why the Government could not recover texts that Appellant and CK deleted. The military judge's finding that these texts were irretrievable was supported by Mr. JY's testimony and was not an assumption as Appellant's counsel claims.[7]

Citing the rule of completeness, Appellant claims the military judge erred in admitting Prosecution Exhibits 1 and 2 because the Government did not recover all of the texts that were exchanged between Appellant and CK, and many of the texts that were recovered were truncated. Military Rule of Evidence 106, also known as the rule of completeness, provides that "when a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing

---

[7] We considered the prosecutorial-misconduct aspect of Appellant's claim, as it is intertwined with this issue. Appellant's counsel claims, "[t]he military judge's ruling not only absolved the government of their malfeasance, but also deprived the Appellant of his right to exercise the rule of completeness with regards to this evidence." To the extent counsel asserts prosecutorial misconduct as the reason why complete text messages were not produced by the Government, we disagree with this assertion. The record does not support the claim that the Government failed to produce exculpatory evidence as required by Article 46, UCMJ, 10 U.S.C. § 846, *Brady v. Maryland*, 373 U.S. 83 (1963), and subsequent cases.

or recorded statement—that in fairness ought to be considered at the same time."

Appellant's reliance on the rule of completeness, Mil. R. Evid. 106, is inapt. By its terms, the rule is principally one that promotes inclusion of evidence, not exclusion. *See also United States v. Goodwin*, 21 M.J. 949, 951 (A.F. Ct. Crim. App. 1986) (the rule "increases the likelihood that evidence submitted to the court . . . will include all relevant information."). It provides no guidance, much less a remedy, for situations like this where another writing or part of a writing is irretrievable or missing through no fault of the proponent. In such cases, the proper question is whether, on balance, the probative value is substantially outweighed by consideration of the consequences of admitting a partial statement under Mil. R. Evid. 403. Here, the military judge acknowledging the truncated texts created a risk of unfair prejudice to include a possibility that irretrievable portions of the texts might contain exculpatory information. Nonetheless, the military judge found the Mil. R. Evid. 403 balancing test favored admissibility because the texts were highly probative and Appellant had the opportunity to cross-examine CK to explore the possibility that there might have been exculpatory text messages. After the close of evidence Appellant was free to argue, and did argue, the messages were incomplete and therefore raised reasonable doubt.

The evidence Appellant sought to exclude showed lascivious communications from Appellant to CK and a consciousness of guilt. The evidence was probative of the charged offenses and not substantially outweighed by the danger of unfair prejudice, confusing the issues, or misleading the factfinder. Mil. R. Evid. 403. The mere possibility that at one time exculpatory evidence might have been included among irretrievable text messages on Appellant's and CK's phones was not grounds to exclude evidence that was discovered by DC3/CFL analysis. We find the military judge did not abuse his discretion in admitting Prosecution Exhibits 1 and 2.

## B. Legal and Factual Sufficiency

### 1. Additional Facts

CK testified that when she was 15 years old and living in a village near RAF Mildenhall, Appellant would insert his finger into her vagina at least once or twice a month in the first half of 2016 during a five-month timeframe charged by the Government. This usually happened in the living room, sometimes in her bedroom, and occasionally in the kitchen. During a 13-month charged timeframe—May 2015 to June 2016—Appellant would have CK place her hand on his genitalia and tell her to stroke or grip his penis. Appellant sometimes had an erection and was aroused during the act. In interviews with MSP and AFOSI investigators, CK denied that Appellant ever engaged with

CK in acts of vaginal intercourse. However, at trial, CK testified that during the same 13-month timeframe Appellant engaged in sexual intercourse with her by penetrating her vulva with his penis. She testified these acts happened in her bedroom, and sometimes in the laundry room, bathroom, kitchen, and pantry, depending on whether others were present in the house.

CK testified Appellant started writing her letters shortly after they moved to the United Kingdom. Trial counsel aptly described the 21 pages that detailed Appellant's sexual feelings and desire for CK as "love letters." CK kept the letters hidden in her bedroom until the investigation began, at which point she told her sister, Appellant's wife, to give them to the AFOSI agents investigating the case. The letters revealed intimate acts Appellant engaged in with CK and Appellant's discontent in his marriage, to include the following:

> I'm coming to terms with the possibility of you going to Michigan. If it happens I hope you think of me. Thank you for rubbing my leg in bed. It calmed me down and I felt loved.

> You are not the reason [my] marriage is crumbling, I don't care what anyone says!

> I fear the future knowing other guys will be all over you . . . Like [R] after gym. It hurt me deeply but there's nothing I can do because it's your decision on who touches you. I want it to be me more and no one else. It's selfish, I know, but I love you that much.

> I also believe that deep down you want to be with me, but you are scared to choose. . . . I get the physical attention when I can but I don't get letters or conversations so I can understand you better.

> [I]f you tell me you had sex with someone else I will not show jealousy hurt or anger, I will respect support and stay loyal to you. . . . Will you be my Girl Friend?

> In my heart I'm already single, it's just a piece of paper that says I'm not[.]

> I would like to be considered a lover since everything we have done. And if that's the case, I'm a lover to love and hold you anytime you need, and to pleasure you.

> I'm hopeful for the future. I want to teach you how to drive, shoot a gun, you be a phenom[e]nal person in bed (cheesy smile)[,] I mean you kinda already are *blush* LoL.

CK testified at one point she broke "emotionally" and started crying when Appellant tried touching her because she wanted him to stop. Appellant reacted with anger, calling CK a "puppeteer" because she "controlled him," and told her that if she "said anything to anyone his career, his family, it would all be over," and Appellant would "go to jail." CK explained she did not tell her sister because CK "actually felt wanted" as a member of the family and feared her sister would send her away. CK explained she initially lied in interviews with MSP and AFOSI investigators, denying Appellant engaged in sexual intercourse with her, because she still cared for Appellant, considered him family, and "didn't want him to get in so much trouble." At trial, the military judge asked CK to explain why she changed her reporting and was now testifying about sexual intercourse that she had previously denied. CK explained she became angry upon learning from her sister that Appellant denied any inappropriate conduct had occurred with CK, so she decided to stop lying to protect Appellant and to tell the truth.

The trial counsel called SSgt JE, a former coworker of Appellant, who testified Appellant once confided in him that Appellant "might be developing feelings" for CK and their relationship was a source of conflict in his marriage. Appellant sought SSgt JE's opinion if "going into [CK's] room when no one else was around . . . was inappropriate or [if] making physical contact, like hugging her, . . . was considered inappropriate."[8] Appellant disclosed that he wrote a letter to CK because "[h]e was unsure whether or not he was actually developing feelings for her." Appellant used the letter "to write down his thoughts," and "was disgusted with how poorly written and how cheesy" it seemed when he reread the letter a few days later.[9] SSgt JE believed the conversation about the letter occurred sometime between April and June 2016.

Next, the trial counsel called Technical Sergeant (TSgt) JE, Appellant's former supervisor, who testified Appellant admitted to him that he and CK "ha[d] been smashing" and had done so "several times." TSgt JE explained "smashing" was a term he heard and used before, and was slang for sex, specifically "vaginal penetration." The following day Appellant described to TSgt JE the first time he had sex with CK, explaining his wife was upstairs watching a movie and his son was outside playing. After these encounters, TSgt JE re-

---

[8] Based on other testimony, Appellant appeared to be questioning a "ground rule" established by his wife that Appellant was not allowed to enter CK's bedroom at all, or at least without knocking first.

[9] Appellant told SSgt JE "there was no way he would ever have romantic feelings for her," which was contrary to Appellant's statements in the handwritten letters he wrote and gave to CK.

ported Appellant's admissions to another NCO and was subsequently questioned by AFOSI agents. TSgt JE's report and initial questioning by the AFOSI agents occurred shortly before CK's relative discovered text messages Appellant sent to CK on her phone, which prompted the report to MSP about Appellant's conduct.

Appellant spoke again with TSgt JE after CK's relative apparently disclosed the texts to Appellant's wife. Appellant relayed to TSgt JE a concern "that somebody had found text messages in [CK's] phone and reported it to the Michigan authorities." Appellant asked TSgt JE to delete any text messages they had exchanged and conveyed the allegations against him were "rape of a minor and adultery." Appellant "wasn't too concerned about the rape because there was no evidence that it had actually occurred." His only concern with a trial "was that if they put [CK] on the [witness] stand . . . she would break down and confess everything." A few days later, Appellant told TSgt JE that to prove Appellant had sexual intercourse with CK "they would have to look through both of their phones, through months of text messages, and that that wasn't possible because they had deleted text messages from both their phones and whenever their phones updated it overwrote the code." Even so, as explained in our resolution of Appellant's first assigned error, the trial counsel presented evidence of deleted texts from Appellant to CK that were partially recovered from CK's phone.

### 2. Law

The military judge convicted Appellant of three offenses in violation of Article 120b, UCMJ. In order for the military judge to find Appellant guilty as charged in this case, the Government was required to prove each element of three specifications beyond a reasonable doubt. The first of two specifications of sexual assault of CK has three elements: (1) that on divers occasions Appellant committed a sexual act upon CK by causing penetration, however slight, of her vulva with his fingers; (2) that at the time of the sexual act CK had attained the age of 12 years but had not attained the age of 16 years; and (3) that Appellant did so with the intent to gratify his sexual desires. *See Manual for Courts-Martial, United States* (2016 ed.) (2016 *MCM*), pt. IV, ¶ 45b.b.(3)(b). The second specification of sexual assault has two elements: (1) that on divers occasions Appellant committed a sexual act upon CK by causing penetration[10] of her vulva with his penis; and (2) that at the time of the sexual act CK had attained the age of 12 years but had not attained the age of 16 years. *See* 2016 *MCM*, pt. IV, ¶ 45b.b.(3)(a). A third specification alleged Appellant's sexual

---

[10] The Government charged penetration as the contact underlying the sexual act. *See* 2016 *MCM*, pt. IV, ¶ 45b.b.(3)(a)(i).

abuse of CK and has two elements: (1) that on divers occasions Appellant committed sexual contact upon CK by causing her hands to touch his penis, and (2) that Appellant did so with the intent to gratify his sexual desires. *See* 2016 *MCM*, pt. IV, ¶ 45b.b.(4)(a).

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

### 3. Analysis

CK's testimony provided convincing proof of each of the elements of the offenses, to include the elements that Appellant penetrated her vulva with his fingers and penis, and caused CK's hands to touch his penis. Other evidence lends support to her testimony and proof of the charged offenses, including admissions Appellant made to two NCOs, handwritten love letters he gave to CK, lascivious texts Appellant sent to her phone, and Appellant's consciousness of guilt by deleting text messages exchanged with CK and instructing CK to do the same. Appellant argues the evidence is legally and factually insufficient to support the convictions because CK and TSgt JE were not credible witnesses, and the letters Appellant wrote and texts he sent to CK showed

11

little more than fantasizing and flirtation by someone dissatisfied with his marriage. We conclude a reasonable factfinder would not find Appellant's challenges to CK's credibility persuasive or the supporting evidence equivocal.

While we have the independent authority and responsibility to weigh the credibility of the witnesses in determining factual sufficiency, we recognize that the trial court saw and heard the testimony. *See United States v. Moss*, 63 M.J. 233, 239 (C.A.A.F. 2006) (citation omitted) (stating it is the members' role to determine whether testimony is credible or biased). Like the military judge who was the factfinder at Appellant's trial, we weigh the evidence in the record and determine whether a discrepancy in a witness's testimony—including a lapse in perception, memory, or recall—resulted from an innocent mistake or a deliberate lie. *See United States v. Goode*, 54 M.J. 836, 844 (N.M. Ct. Crim. App. 2001).

Testimony "need not be completely consistent to still be sufficiently reliable to sustain a conviction, and we do not confine our analysis to merely the testimony of a single witness in performing our factual sufficiency review under Article 66, UCMJ." *United States v. McFadde*n, No. ACM 38597, 2015 CCA LEXIS 520, at *11 (A.F. Ct. Crim. App. 18 Nov. 2015) (unpub. op.); *see also United States v. McElhaney*, 50 M.J. 819, 832 (A.F. Ct. Crim. App. 1999) (concluding evidence factually sufficient, in part, because the appellant's wife corroborated appellant's romantic relationship with victim notwithstanding appellant's claim that victim's testimony was implausible and inconsistent), *rev'd on other grounds*, 54 M.J. 120 (C.A.A.F. 2000). We have considered the discrepancies in CK's pretrial statements and testimony, along with biases and motives advanced by Appellant both at trial and on appeal. We conclude Appellant was convicted as much on his own unmistakable admissions as CK's testimony.

Considering the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty beyond a reasonable doubt. After weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we too are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions both legally and factually sufficient.

## C. Allegation of Ineffective Assistance of Counsel

Appellant was represented by military and civilian counsel at trial. Appellant claims his trial defense counsel were ineffective because no character witnesses were called to testify in findings. Appellant identifies SSgt JS as a potential witness who could have offered favorable evidence, though provides no information about his relationship with Appellant or the foundation for character evidence SSgt JS may have given. We are not persuaded Appellant's counsel were deficient, much less ineffective.

### 1. Additional Background

After trial, Appellant submitted a declaration alleging prejudice from the failure of his trial defense counsel to call any character witnesses on his behalf. Appellant does not specify a pertinent character trait that counsel were deficient in failing to offer evidence to prove, but generally avers that SSgt JS's testimony could have raised reasonable doubt if he had been called to testify. In response to Appellant's claims, Appellant's military defense counsel, Major (Maj) JB, provided an affidavit to the court that illuminated Appellant's character traits the trial defense counsel considered offering, and why they chose not to do so.

Maj JB explained that during the preparation of Appellant's defense, "[v]arious individuals were contacted and asked to provide information via affidavits and character letters." SSgt JS provided two affidavits: one about Appellant's character for truthfulness, and one about Appellant's respect towards women. Maj JB explained that the Defense did not put forward character for truthfulness because Appellant elected against testifying. The Defense decided against presenting other character evidence during findings, such as respecting women, because the alleged victim in the case was a child and resided in Appellant's home during the charged timeframe.

### 2. Law

The Sixth Amendment to the United States Constitution[11] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984) (citations and footnote omitted). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). Accordingly, we "will not second-guess the strategic or tactical decisions made at trial by defense counsel," *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (quoting *United States v. Anderson*, 55 M.J. 198, 202 (C.A.A.F. 2001)), and consider "whether counsel's performance fell below an objective standard of reasonableness." *United States v. Gutierrez*, 66 M.J. 329, 331 (C.A.A.F. 2008) (citations omitted).

We review allegations of ineffective assistance of counsel de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *Mazza,* 67 M.J. at 474). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient and that the appellant was prejudiced by the error." *United States v. Captain*, 75 M.J. 99,

---

[11] U.S. CONST. amend. VI.

103 (C.A.A.F. 2016) (citing *Strickland*, 466 U.S. at 698). We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Gooch,* 69 M.J. at 362 (alteration in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

"An appellant must establish a factual foundation for a claim of ineffectiveness; second-guessing, sweeping generalizations, and hindsight will not suffice." *United States v. Davis*, 60 M.J. 469, 473 (C.A.A.F. 2005) (citing *United States v. Key*, 57 M.J. 246, 249 (C.A.A.F. 2002); *United States v. Alves*, 53 M.J. 286, 289 (C.A.A.F. 2000); *United States v. Gray*, 51 M.J. 1, 19 (C.A.A.F. 1999)).

**3. Analysis**

Appellant's declaration does not identify any favorable character witnesses besides SSgt JS, much less a pertinent character trait the Defense may have offered through SSgt JS or another witness.[12] Even if we were to accept the underlying facts in the assigned error, we nonetheless find Appellant has failed to meet his burden to establish either deficiency or prejudice, *Captain*, 75 M.J. at 103, and so we reject Appellant's claims without regard to the assertions in his declaration. *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997) ("[I]f the facts alleged in the affidavit allege an error that would not result in relief even if any factual dispute were resolved in appellant's favor, the claim may be rejected on that basis.").

Maj JB noted that the Defense strategically decided against presenting character evidence during findings. Given that consent and mistake of fact as to consent were not defenses to any charged offense because the complaining witness was a child, it was objectively reasonable that the Defense chose not to present evidence of Appellant's character for respect towards women. We

---

[12] *See United States v. Moulton*, 47 M.J. 227, 230 (C.A.A.F. 1997) ("When factual information is central to an ineffectiveness claim, it is the responsibility of the defense to make every feasible effort to obtain that information and bring it to the attention of the appellate court.").

will not second-guess this strategy. *Mazza*, 67 M.J. at 475. Accordingly, we find Appellant has failed to meet his burden of showing he was denied effective assistance of counsel.

### D. Sentence Severity

Appellant claims that his sentence, which includes a dishonorable discharge and confinement for 59 months, is unduly severe in comparison to sentences in cases involving similar convictions. Appellant identifies 14 court-martial cases unrelated to his own with a summary of the findings of guilty and sentence in each. Although some of the cases, like Appellant's, included more than one conviction for violations of Article 120b, UCMJ, all but one included findings of guilty for additional offenses ranging from wrongfully providing alcohol to a minor, assault consummated by battery, indecent acts and exposure, and various offenses involving child pornography. Consequently, Appellant suggests this court should consider cases unlike his own.

#### 1. Law

We review sentence appropriateness de novo. *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006). We "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as [we] find correct in law and fact and determine[ ], on the basis of the entire record, should be approved." Article 66(c), UCMJ. "We assess sentence appropriateness by considering the particular appellant, the nature and seriousness of the offense[s], the appellant's record of service, and all matters contained in the record of trial." *United States v. Anderson*, 67 M.J. 703, 705 (A.F. Ct. Crim. App. 2009) (per curiam) (citations omitted). While we have great discretion in determining whether a particular sentence is appropriate, we are not authorized to engage in exercises of clemency. *Id.* (citations omitted); *see United States v. Nerad*, 69 M.J. 138, 146–48 (C.A.A.F. 2010).

We "are required to engage in sentence comparison only 'in those rare instances in which sentence appropriateness can be fairly determined only by reference to disparate sentences adjudged in closely related cases.'" *United States v. Sothen*, 54 M.J. 294, 296 (C.A.A.F. 2001) (quoting *United States v. Ballard*, 20 M.J. 282, 283 (C.M.A. 1985)). When arguing sentence disparity and asking us to compare his sentence with the sentences of others, Appellant bears the burden of demonstrating those other cases are "closely related" to his, and if so, that the sentences are "highly disparate." *See United States v. Lacy*, 50 M.J. 286, 288 (C.A.A.F. 1999). Cases are "closely related" when, for example, they include "coactors involved in a common crime, servicemembers involved in a common or parallel scheme, or some other direct nexus between the servicemembers whose sentences are sought to be compared . . . ." *Id.* If an

appellant carries that burden, then the Government must show a rational basis for the sentence differences. *Id.* We acknowledge that we may compare an appellant's case to other non-"closely related" cases in order to assess the propriety of the sentence, although we are not required to do so. *See United States v. Wacha*, 55 M.J. 266, 267–68 (C.A.A.F. 2001); *Lacy*, 50 M.J. at 288. However, unless the cases are closely related, "[t]he appropriateness of a sentence generally should be determined without reference or comparison to sentences in other cases." *United States v. LeBlanc*, 74 M.J. 650, 659 (A.F. Ct. Crim. App. 2015) (en banc) (citing *Ballard*, 20 M.J. at 283).

### 2. Analysis

Appellant fails to demonstrate a closely related case disparate to his own. Appellant was not a co-actor involved in a common crime; he was not involved with other Airmen in a common or parallel scheme; and there was no "direct nexus" between Appellant and any other servicemember whose sentence Appellant might invite us to compare to his own. Nor do we find discretionary comparisons with non-closely related cases either instructive or appropriate.

We have given individualized consideration to Appellant, the nature and seriousness of his offenses as shown by the facts and circumstances, his record of service, and all other matters contained in the record of trial. During the charged timeframe, Appellant sexually assaulted his sister-in-law who stood in relation to Appellant as his military dependent and minor child. On these facts we are assured the military judge gave individualized consideration to Appellant, as have we.

Appellant faced a maximum term of confinement of 80 years. Trial counsel recommended a sentence of confinement for seven years, total forfeitures of pay and allowances, and reduction to the grade of E-1. A dishonorable discharge was mandatory. Trial defense counsel argued to limit confinement to three to five years. We find Appellant's approved sentence of a dishonorable discharge, confinement for 59 months, and reduction to the grade of E-1 is not inappropriately severe as a matter of law.

### E. Incomplete Convening Authority's Action

At trial, Appellant moved for appropriate relief for the 11 hours he was denied repeated requests to speak to his defense counsel after AFOSI agents directed him to provide handwriting exemplars as evidence on the referred charges, and did not allow Appellant to leave the AFOSI detachment until he complied. The military judge determined the agents' conduct constituted illegal pretrial punishment under Article 13, UCMJ, 10 U.S.C. § 813, and ordered two days credit against Appellant's sentence to confinement. The Report of Result of Trial memorandum and Department of Defense Form 2707-1 (DD Form

2707-1)[13] correctly announced the two-day credit as did the staff judge advocate's recommendation to the convening authority. However, the credit is omitted in the initial action of the convening authority and the court-martial order.

In *United States v. Crawford*, 62 M.J. 411 (C.A.A.F. 2006), the United States Court of Appeals for the Armed Forces (CAAF) held that if an appellant establishes a violation of Article 13, UCMJ, "then R.C.M. 305(k) provides him additional credit for each day of pretrial confinement that involves an abuse of discretion or unusually harsh circumstances." *Crawford*, 62 M.J. at 414 (citations and internal quotation marks omitted). Accordingly, when a military judge orders credit for illegal pretrial confinement for violations of Article 13, UCMJ, the credit shall be included in the convening authority's initial action. Rule for Courts-Martial (R.C.M.) 1107(f)(4)(F). "Because of the importance of the convening authority's action in the court-martial process," the CAAF requires it to be both "clear and unambiguous." *United States v. Politte,* 63 M.J. 24, 26 (C.A.A.F. 2006) (footnote omitted). We may instruct a convening authority to withdraw an incomplete, ambiguous, or erroneous action and substitute a corrected action.[14] R.C.M. 1107(g); *see also* R.C.M. 1107(f)(2).

The convening authority's action was incomplete because it omitted the credit ordered by the military judge for illegal pretrial punishment, as required by R.C.M. 1107(f)(4)(F). We order a corrected action that announces the two-day credit ordered by the military judge.

## III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and the sentence are **AFFIRMED**. The record of trial is returned to The Judge Advocate General for remand to the convening authority to withdraw the incomplete action, substitute a corrected action, and issue a corrected

---

[13] DD Form 2707-1, *Department of Defense Report of Result of Trial* (Mar. 2013), is attached to DD Form 2707, *Confinement Order* (Mar. 2013), and included in the record of trial.

[14] A "corrected action" ordered pursuant to R.C.M. 1107(g) is not a "new action," and unlike a new action does not require post-trial processing anew. *See United States v. Mendoza*, 67 M.J. 53, 54 (C.A.A.F. 2008).

court-martial order. Thereafter, the record of trial will be returned to this court for completion of appellate review in accordance with Article 66, UCMJ.

FOR THE COURT

*[signature: Carol K. Joyce]*

CAROL K. JOYCE
Clerk of the Court